ROUKOUS et al. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. April 18, 1912.)

No. 894.

**1. Conspiracy (§ 28\*)—Concealment of Bankrupt's Assets.**

Bankr. Act July 1, 1898, c. 541, § 29b, 30 Stat. 554 (U. S. Comp. St. 1901, p. 3433), provides that a person shall be punished by imprisonment on conviction of having knowingly and fraudulently concealed while a bankrupt, or after his discharge, from his trustee, any of the property belonging to his estate in bankruptcy. *Held*, that an indictment for conspiracy to conceal assets in contemplation of bankruptcy was not objectionable because there was no existing bankruptcy when the conspiracy was originated. Alkon v. United States, 163 Fed. 810, 90 C. C. A. 116, followed.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 40, 41; Dec. Dig. § 28.\*]

**2. Conspiracy (§ 40\*)—Concealment of Bankrupt's Assets—Individual Conspirators.**

Cohen v. United States, 157 Fed. 651, 85 C. C. A. 113, followed, to the effect that individuals may be guilty of conspiracy which included in its purpose a fraudulent concealment of the assets of a bankrupt corporation, even if the corporation may not be charged as a conspirator.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 73, 75–78; Dec. Dig. § 40.\*]

**3. Conspiracy (§ 25\*)—Concealment of Bankrupt's Assets.**

The rule that one is responsible for the result of his intentional tort, though the injury be sustained by one he did not have in mind, makes conspirators for a fraudulent concealment of assets liable as for concealment from the trustee in future bankruptcy, whether that particular injury was intended or not.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 35; Dec. Dig. § 25.\*]

**4. Conspiracy (§ 47\*)—Concealment of Bankrupt's Assets—Evidence—Sufficiency.**

In a trial for conspiring to conceal assets in bankruptcy, evidence *held* insufficient to show that a particular defendant committed any unlawful act in the district.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 105–107; Dec. Dig. § 47.\*]

**5. Criminal Law (§ 552\*)—Proof Required to Convict.**

The rule applied that while it is unnecessary that any particular circumstance should of itself be sufficient to prove a criminal case beyond reasonable doubt, each circumstance offered as a part of the combination of proofs must be maintained beyond reasonable doubt, and at least be free from the condition of being as consistent with innocence as with guilt.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1257, 1259–1262; Dec. Dig. § 552.\*]

**6. Criminal Law (§ 422\*)—Conspirators—Declarations—Admissibility.**

In a trial for conspiracy to conceal assets of a bankrupt, the trial judge did not abuse his discretion in admitting evidence of acts and declarations by one defendant concerning another bankruptcy proceeding a year before the particular offense, where the evidence tended to show his opportunities for assisting in concealing goods.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 984–988; Dec. Dig. § 422.\*]

In Error to the Circuit Court of the United States for the District of Rhode Island.

George Roukous and another were convicted of an offense (170 Fed. 110), and they bring error. Affirmed as to Roukous; reversed and remanded as to defendant Adams.

Boyd B. Jones, of Boston, Mass., and Walter H. Barney, of Providence, R. I., for plaintiffs in error.

George H. Huddy, Jr., Asst. U. S. Atty. (Charles A. Wilson, U. S. Atty., and Walter R. Stiness, on the brief), for the United States.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This was an indictment found in the District of Rhode Island against Carroll H. Chapman and George Roukous, who at the time of the finding of the indictment and of the alleged offense set out therein were residents of Providence, R. I., and Joseph Adams, a resident of Rockland, in the state of Maine. All three were convicted, but Chapman sued out no writ of error. In accordance with the settled practice, the other two, Roukous and Adams, were entitled to sue out writs of error without joining Chapman. All we need extract from the indictment is as follows:

"That the Young & Holland Company, a corporation created and organized under the laws of the state of Rhode Island, Carroll H. Chapman, and George Roukous, both of the city and county of Providence, in the state of Rhode Island, Joseph Adams, of the city of Rockland, in the state of Maine, together with other persons to the grand jurors unknown, heretofore, to wit, during the months of July, August, and September, in the year of our Lord nineteen hundred and seven, a more particular date being to the grand jurors unknown, at, to wit, said city of Providence, and within the jurisdiction of this court, did unlawfully, willfully, and corruptly conspire, combine, confederate, and agree together to commit an offense against the United States, in and by corruptly and fraudulently agreeing together, in anticipation of the involuntary bankruptcy of the said the Young & Holland Company, to be brought about and accomplished by the said Carroll H. Chapman, with the knowledge and connivance of the said other conspirators, unlawfully, willfully, knowingly, and fraudulently, while the said the Young & Holland Company was a bankrupt, to conceal from the trustee in bankruptcy of the said the Young & Holland Company, to be thereafter appointed, certain merchandise and property, hereinafter mentioned, belonging to the estate in bankruptcy of the said the Young & Holland Company, it being then and there a part of said scheme and conspiracy for the said Carroll H. Chapman, who was then and there president and managing officer of the said the Young & Holland Company and the owner of a majority or all of the capital stock of said the Young & Holland Company, with the knowledge and connivance of said other conspirators and with the purpose and intent of forcing the filing of a petition in bankruptcy against the said the Young & Holland Company, in the District Court of the United States in and for the District of Rhode Island, to cause the said the Young & Holland Company to commit acts of bankruptcy, to wit, to remove large quantities of merchandise, consisting of the greater portion of the then stock in trade of said the Young & Holland Company from the place of business of said the Young & Holland Company and from certain warehouses, freighthouses, and places, in the city of Providence, where the said property of said the Young & Holland Company was located, and to place said merchandise and property of said the Young & Holland Company beyond the reach of the creditors of said the Young & Holland Company by the concealment thereof, and to dispose of the balance of said stock in trade by sale thereof to one Joseph Gilbert, of said Providence,

for no consideration other than the notes of said Joseph Gilbert and a personal property mortgage, given by said Joseph Gilbert, upon the property so sold to him, as security for the payment of said notes, all of said acts being done with the intent and purpose of hindering, delaying, and defrauding the creditors of said the Young & Holland Company."

The indictment then proceeded with allegations that thereafterwards, on the 1st day of October, 1907, a petition in involuntary bankruptcy was filed against the Young & Holland Company by sundry creditors, which petition alleged the insolvency of the Young & Holland Company, and that, with intent to hinder, delay, and defraud its creditors, it had, on the 27th day of September, 1907, committed an act of bankruptcy, in that it "had conveyed, concealed, and removed its property by conveying its stock in trade which it had on said date to said Joseph Gilbert, in violation of the bankruptcy laws of the United States." Joseph Gilbert was not alleged to be one of the conspirators, or to have been acting with them in any way in connection with this alleged conspiracy. It was further alleged that the Young & Holland Company answered the petition, and were adjudged bankrupts on the 30th day of November, 1907; and the record shows that the proceeding in bankruptcy was stoutly resisted.

[1, 2] The United States relies on section 29b of the Bankruptcy Act of July 1, 1898, as follows:

"A person shall be punished by imprisonment for a period not to exceed two years upon conviction of the offense of having knowingly and fraudulently concealed while a bankrupt or after his discharge from his trustee any of the property belonging to his estate in bankruptcy."

Also section 5440 of the Revised Statutes, as amended by Act May 17, 1879, c. 8, 21 Stat. 4 (U. S. Comp. St. 1901, p. 3676), is relied on, as follows:

"If two or more persons conspire either to commit any offense against the United States or to defraud the United States in any manner or for any purpose and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

One fundamental proposition of the plaintiffs in error is that the provision cited from the bankruptcy statutes does not apply to corporations; so that, as no offense could have been committed by the Young & Holland Company, it is legally impossible to lay a charge of criminal conspiracy in reference to any concealment or intended concealment by that corporation, and another is, that the charge set out in the indictment could not be effectively alleged as to an act which in its nature was incapable of being committed at the time the conspiracy was formed.

The second of these propositions was on full consideration determined by us against the plaintiffs in error by an opinion passed down on August 13, 1908, in Aikon v. United States, 163 Fed. 810, 811, 812, 90 C. C. A. 116. As to the other proposition, the first section of the bankruptcy statute of July 1, 1898, clearly covers by the word "bankrupt" a corporation. Therefore, except for the fact that the penalty under section 29b of that statute is limited to imprisonment,

which, of course, is an impossible penalty as applied to a corporation, there would be no difficulty arising in this behalf, either under the bankruptcy statute or under section 1 of the Revised Statutes (U. S. Comp. St. 1901, p. 3) or any ordinary rules of construction. In accordance with United States v. Union Supply Company, 215 U. S. 50, 30 Sup. Ct. 15, 54 L. Ed. 87, section 29b would include a corporation if the penalty permitted a fine, either with or without imprisonment, on fundamental rules of construction, which permit distribution of what ought to be distributed. But whether in view of any principles of the common law or of the statutes of the United States with reference to aiders and abettors, or on any possible rules of construction, the favor granted to the criminal statutes by United States v. Union Supply Company can be extended to this provision of the bankruptcy statute, we are relieved from determining by other considerations relating hereto. Field v. United States, 137 Fed. 6, 69 C. C. A. 568, decided by the Circuit Court of Appeals for the Eighth Circuit, is not in point. Cohen v. United States, 157 Fed. 651, 85 C. C. A. 113, decided by the Circuit Court of Appeals for the Second Circuit, is otherwise. Indeed, the indictment in the present case seems to have been drawn from what appears in that decision almost verbatim. Following our practice with reference to prior decisions by the Circuit Courts of Appeals for other circuits, we yield to the determination in Cohen v. United States. We thus conclude against the plaintiffs in error the two propositions we have stated.

[3] One of the most difficult propositions in the case is whether there is any evidence that the conspiracy contemplated any future proceedings in bankruptcy as alleged. The record so absolutely fails to disclose any evidence of a direct or positive character that the learned judge did not rely on any proofs of that nature: It is apparent that he rested this branch of the case inferentially, saying as follows:

"Now, gentlemen, if you are satisfied in this case that there was a conspiracy to conceal from some one, then the burden rests upon the government to satisfy you beyond a reasonable doubt that it was a trustee in bankruptcy. It is a very practical question to say, 'Let us hide it, let us conceal it'; and the next question is, 'Who is coming after it, who would be after it?' If you have something, gentlemen, in a place where nobody is going, you leave it there. Things are hidden in anticipation of somebody who will either see or find the object, somebody who will go looking for it, or who may see it as they pass by. If you are satisfied that there was a concealment, from whom did these parties intend to make a concealment; and upon that subject you may be assisted by a consideration of the bankruptcy law which stands as a legal fact and as a business fact supposed to be known to every man of competent age by legal presumption, and as a practical proposition known to most men who are in business, and proven to be known specifically to some of the men from actual experience in the case.

"Now, there are two possibilities. Of course, assuming that this property actually was property of the bankrupt, the creditors could come, they could attach in a state court, and they could attach in the United States court if they had proper diversity of citizenship. But the national bankruptcy law contains provisions which supersede all rights of creditors under such attachments under certain circumstances. The moment that law is invoked, and an adjudication is made, those attachments and those rights of creditors are dissolved, and the bankruptcy law takes effect, as I have already explained to you. The trustee then, if appointed, becomes the representative of

the creditors, and the whole body of creditors represented by the trustee are to work out their rights.

"Now, gentlemen, as a practical proposition, these parties may have hoped that bankruptcy would not ensue, they may have hoped; and there is evidence in this case that they endeavored to prevent an adjudication. Mr. Chapman states that he used the name of Chase on account of some fears concerning the service of papers. That all may be, gentlemen; but did the plan anticipate and provide for the contingency of the appointment of a trustee? Consider the rights under the law, the usual methods of business in the administration of the bankruptcy law, and determine whether this plan comprehended in its scope, if it was made, that the person who would have the ultimate right was to have that property concealed from him."

Thus the court permitted the jury to supply direct and positive evidence with what might be described as an inference, dependent on the proposition that there was a conspiracy which the jury could find was a conspiracy to conceal from some one. It cautioned the jury that a mere intention to conceal generally, with the added purpose to deliver up the assets promptly on the appointment of a trustee in bankruptcy, would not be an offense within the indictment alleged against the plaintiffs in error. This was a caution in the event that such a subordinate intention existed; but such an intention was necessarily negatived by the verdict. If, moreover, the case had suggested the possibility that the concealment might have been lawful in any event whatever, it might have been necessary to have proven by affirmative evidence a purpose to defeat bankruptcy proceedings: but, assuming that the concealment was by its nature unlawful, so that the purpose was necessarily unlawful, that purpose must inferentially be taken to have related to any consequent result of an unlawful character, whether specifically in the minds of the parties combining or not. In this respect the law is the fundamental rule applicable to the act of a person intending a tortious injury to another person, who becomes responsible for the result although that result injures one whom the actors had not in mind, provided the injury was under the circumstances a natural consequence of the illegal deed. This is a rule of inference of law, applying alike to homicide and all inferior torts, and of so broad and fundamental a character that it reaches the case at bar.

In making this statement, we bear in mind that it was not necessary, in order to sustain this verdict, to show that all the details set out in the indictment were accomplished, as many of them might have been rejected as surplusage and yet the substance of the offense have remained. This was merely that the assets should be withheld from the trustee in bankruptcy in case one should be appointed under any form of proceedings. As, for example, whether or not such proceedings should be voluntary or involuntary was wholly immaterial; as also whether the bankruptcy proceedings should be brought about and accomplished by Chapman, with or without the connivance of the other conspirators, was also wholly immaterial, the only material thing being, as alleged in the indictment, the purpose "to conceal from the trustee in bankruptcy of the said the Young & Holland Company to be thereafter appointed certain merchandise and property hereinafter mentioned." Thus, again, the familiar illustration comes in that,

where there is an evil intention to assault or kill generally or miscellaneously, it may be alleged and proved that the conduct of the criminal was moved by malice against the particular person injured or killed, provided that person was within the natural range of the injury involved in the general intention. So here the general criminal purpose to conceal goods existing, that purpose may be alleged as having relation to whomsoever may in fact have been defrauded as the practical result of the intention, whether general creditors or a trustee in bankruptcy, provided the actual injury was, in accordance with the general rules, within the natural range of the illegal act. This proposition is illustrated by the opinion passed down on March 18, 1912, in the Supreme Court in Thomas v. Taylor, 224 U. S. 73, 32 Sup. Ct. 403, 56 L. Ed. ——, where, in sustaining a judgment for plaintiff, who had been misled by the publication of a false national bank report, but who could not possibly have been in the mind of the directors sued, it had been alleged that the report was "with the intention of deceiving the public, and, among others, the plaintiff." Considering the case from this point of view, we are clear that there is nothing in this topic of which the plaintiffs in error can complain.

Also, it is so plain that an overt act was proved that we need not go into details in demonstrating that proposition.

[4] On the other hand, we cannot so easily dispose of the claim of Adams that he committed no offense in Rhode Island, justiciable in the federal courts in that district. Under the law, he must have been present there taking part in the conspiracy, or at least have initiated something which produced physical effects in that district, as, for example, mailing a letter which was delivered there. It is not sufficient that he co-operated in the overt act in some other district, or that in some other district he assented to the conspiracy or any part of it. He must have been proved beyond a reasonable doubt to have been present in the District of Rhode Island, there co-operating in or consenting to the conspiracy, either in fact or by implication of law. We are wholly unable to find any evidence in the record of any such presence for any such purpose. Four witnesses testified to having met him at Providence; but none of them testified to anything which affords any positive suggestion of anything of the character which the case requires.

The United States attempted to work out the case against Adams inferentially. We have carefully examined the charge of the learned judge, but are unable to find much assistance from it on this. The jury were properly told that they must find that the conspiracy was formed in Rhode Island; but the application of the evidence on this as between Chapman, Roukous, and Adams was not pointed out, although the jury was carefully cautioned that certain other details of evidence might be considered as weighing against the other defendants, or one of them, but should not be taken as against Adams. The court also pointed out the general rules with reference to the frequent necessity of establishing conspiracy by circumstantial evidence, and also the general rules governing the application of that kind of evidence. It put a striking illustration of three men coming from different parts of the country, meeting, one of them afterwards buying

in one locality nitroglycerine, another a revolver, and another a handful of putty or a roll of putty, and then all meeting again at a post office, taking their positions conveniently for exploding the safe, with a subsequent explosion. The court supposes that no word was proved to have been said; and yet there would be evidence that the three men acted by common design, because of the fitting nature of the things done, and of other details mentioned by the court. But in that illustration one end was tied up—that is, the meeting at the post office and the subsequent explosion—while in the case at bar, so far as Adams was concerned, neither end was tied up. There is not a particle of evidence that he ever had any dealings at Providence with Chapman, who was the principal in the conspiracy and in whose interest it was formed, or that he had any interest whatever in carrying out the criminal conspiracy, or any inducement to assist therein, or that he even knew Chapman prior to the shipment of the goods to him at Rockland, or that he ever gave any directions about the shipment. On the other hand, the record shows sufficient lawful purpose for his visiting Providence, Roukous being his brother-in-law, and Adams having made during his visit there a very considerable purchase of goods, which it is not claimed was ·out of his regular course of business. There is no proof whatever in the record to connect him with the conspiracy except the fact that the goods came to his store at Rockland, Me., that he apparently conceived that Roukous, his brother-in-law, was in some way connected with them, and apparently undertook to protect him by silences at some times and by some equivocation at others, the equivocation not being of a decisive character.

We carefully considered the oral argument in behalf of the United States, and we have carefully searched the brief of their counsel for the purpose of ascertaining what particulars were relied on to sustain the prosecution against Adams. It is true that the goods which were secreted were received by Adams at Rockland. They came along there by steamboat subsequent to Adams' purchase of goods of his brother-in-law at Providence, and either mixed up with those goods which he purchased or subsequent to his receipt of them. The record is confused as to dates, but there is not a particle of evidence in the record that Adams was advised of their coming in advance thereof, or that he had any reason to believe that they were shipped by any other person than his brother-in-law, Roukous, or by whom they were shipped. It is also true that they remained at Rockland until July, 1909, when they were reshipped to Providence, and came finally into the hands of the trustee in bankruptcy under an arrangement made between Chapman and him. It is also true that soon after the goods were received at Rockland Chapman made a visit there, coming with others. Why he visited there is not made apparent. It is also true that while there he communicated with Adams, but why he communicated with Adams is also not made apparent. It is also true that in a statement made by Adams, and taken down by a stenographer at Rockland, in January, 1909, Adams was asked about a lot of goods received in October, 1907, which he then said he purchased from Roukous, perhaps 20 or 25 cases or more, and which he said he bought for his winter's supply. The proof shows clearly enough that Adams

was in Providence in August, and made his purchases from Roukous that month; and one of the witnesses who was called for the United States, and who checked off the records of the steamboat line and the railroad companies, shows that all the goods ordered by Chapman were forwarded during the month of September in sundry lots, so that it was not beyond the right of Adams to maintain, when his attention was called to the date, October, 1907, that he assumed himself to be inquired of only in reference to 20 or 25 cases, more or less, which he bought from his brother-in-law. It is true Adams' statement to which we refer denies that he met Chapman's party at Rockland, or at least some who were in that party, but beyond that none of his statements were contradicted by anything which the record shows.

It seems that, when the goods came back to Providence, they had been shipped by a man by the name of Cook, addressed to one Williams; and the United States maintains, in a manner wholly unsupported, that this reshipment was made by Adams under the name of Cook with fictitious names of consignees. The United States brief unqualifiedly states the proposition in this way; and yet an examination of the proofs given by the witnesses for the United States shows, beyond any reasonable doubt, by the testimony of cartmen and railroad men called at Rockland, several of them in all, the testimony being entirely consistent on this proposition, that Adams had no share in making the reshipments of the goods, except helping to lift one or two heavy cases on the trucks. The shipments were made by a man apparently unknown to anybody in the case, who registered himself at the railroad freight office as Cook, and who directed the consignments, including the name of Williams. So far from the evidence sustaining the proposition of the United States in this particular, it squarely contradicts it.

There is also evidence relied on by the United States that goods in some of the cases returned to Providence showed that they had been taken out and offered for sale, and, while most of them were in whole packages such as might be found in the hands of a wholesaler, some of them had various evidences of having gone through the hands of retailers. There is not a particle of evidence to show whether this confusion of goods resulted from what was done before they were shipped to Rockland, while they were there, or subsequent to their return.

While it is true that what took place at Rockland, or anywhere else, subsequently to the formation of the conspiracy, might have weight retroactively as evidence against Adams, yet the record fails to disclose anything which is not as consistent with his innocence as with his guilt, unless it be the matter of his denying the meeting with Chapman and others at Rockland, a matter which at least is only of small significance, and wholly insufficient, unless connected with other circumstances of a much more positive and efficient character, to convict Adams under any rules which have ever been stated with reference to proving each of several circumstances beyond a reasonable doubt when the case is undertaken to be sustained by circumstantial evidence.

[5] Therefore, remembering that, while it is not necessary that any particular circumstance should of itself be sufficient to prove a criminal case beyond a reasonable doubt, yet it is necessary that each circumstance offered as a part of the combination of proofs should itself be maintained beyond a reasonable doubt, and should have some efficiency, so far as it has efficiency to a greater or less range, beyond a reasonable doubt, and at least be free from the condition of being as consistent with innocence as with guilt, we are compelled to hold that the United States hardly maintain the proposition that Adams shared in the conspiracy in any manner, and particularly that they fail to prove that he joined in the conspiracy, or did any act in reference thereto, within the District of Rhode Island, either in fact or in the theory of the law. Consequently the judgment must be reversed as to Adams.

[6] This leaves only a number of exceptions to the admission of evidence, all of which, however, may be properly treated as raising a single proposition. They concern only Roukous, and would have concerned only him if we had reached a different conclusion as to Adams. They relate to acts and declarations by Roukous in reference to a bankruptcy of one Comstock, all of which occurred a year previous to those under investigation here. This brings into the case a troublesome topic, which we were able to dispose of in Keliher v. United States, 193 Fed. 8, in an opinion passed down on January 12, 1912, satisfactorily so far as that case was concerned. It should be borne in mind, however, that the law is less harsh than the community, and always gives an opportunity for repentance when it can; and for the same reason it seeks to put to sleep the recollection of offenses which have been committed. The general rules are stated by Greenleaf, and also well stated and analyzed in Chase's Stephen's Evidence (2d Ed.) 34 and sequence, and 357. A careful application of the rules given by these text-writers will almost always avoid any difficulties. The apparent remoteness growing out of the different dates of the two groups of transactions is apparently within the ordinary rules as to the extent of the discretion of the court in reference thereto; and the entire mass of evidence concerned had an evident tendency to show that Roukous was practically prepared to render assistance in concealing goods from the fact that he had under control at least two localities where they could be secretly stored with apparent probability of success. We do not feel authorized to disturb the verdict on this account.

The judgment of the Circuit Court as to Roukous is affirmed; the judgment of the Circuit Court and the verdict as to Adams are reversed and set aside; and the case is remanded to the District Court for further proceedings in accordance with law.