WOLF et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. November 16, 1916.)

No. 1433.

1. BANKRUPTCY ⊕═495—OFFENSES—CONCEALMENT OF PROPERTY—EVIDENCE.
    In a prosecution of two brothers, who were, respectively, the president and the secretary treasurer of a bankrupt mercantile corporation, evidence *held* insufficient to show that the president, notwithstanding frequent visits to the corporation's store, knew of, or participated in, the concealment from the trustee in bankruptcy of the goods of the corporation by the secretary treasurer, who managed the business.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 912; Dec. Dig. ⊕═495.]

2. CRIMINAL LAW ⊕═560—DEGREE OF PROOF—MORAL PROBABILITY.
    Moral probability, however strong, cannot take the place of legal evidence, and any inference of guilt which the jury may draw in a criminal prosecution must be based on facts tending to show guilt.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1266; Dec. Dig. ⊕═560.]

3. CRIMINAL LAW ⊕═308—PRESUMPTION OF INNOCENCE—WEIGHT OF CIRCUMSTANCES.
    The presumption of innocence is an instrument of proof in favor of accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created, and it is not overcome by facts which are not plainly inconsistent with innocence.
    [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 731; Dec. Dig. ⊕═308.]

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. BANKRUPTCY ☞492—OFFENSES—CONCEALMENT OF PROPERTY—OFFICERS OF CORPORATION.

Officers of a bankrupt corporation can be convicted of fraudulently concealing from the trustee the property of the corporation in violation of Bankr. Act July 1, 1898, c. 541, § 29b, 30 Stat. 554 (Comp. St. 1913, § 9613), making it punishable knowingly and fraudulently to conceal, while a bankrupt, from the trustee any of the assets of the estate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. ☞492.]

Woods, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Sam Wolf and Benjamin Wolf were convicted of concealing property from a trustee in bankruptcy in violation of Bankr. Act, § 29b, and they bring error. Judgment against Benjamin Wolf affirmed, and judgment against Sam Wolf reversed, with instructions to grant a new trial.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

D. S. Henderson, of Aiken, S. C., for plaintiffs in error.

J. Waties Waring, Asst. U. S. Atty., of Charleston, S. C. (Francis H. Weston, U. S. Atty., of Columbia, S. C., on the brief), for defendant in error.

KNAPP, Circuit Judge. The plaintiffs in error, Sam Wolf and Benjamin Wolf, who are brothers, were both convicted of concealing property in violation of section 29b of the Bankruptcy Act. There is no reason to doubt the guilt of Benjamin Wolf, and the only question here, assuming that demurrers to the indictments were properly overruled, is whether the evidence against Sam Wolf was sufficient to warrant submission to the jury.

The record shows these facts: For the last 11 years and upwards Sam Wolf has lived and carried on, apparently with some success, a mercantile business at Johnson's, S. C. Prior to that he was a peddler. In the early part of 1913 he started another store at Aiken, some 30 miles distant, which he conducted, with the aid of Benjamin Wolf, for about a year in his own name. He then had the business incorporated, as the Aiken Dry Goods Company, for the reason, as he says, that he was only able to run the store at Johnson's, and so turned over the Aiken store to his brother. How the capital stock was divided between them, or otherwise owned, is not disclosed; but Sam Wolf was president of the company, and Ben Wolf its secretary and treasurer. The latter, according to the proof, had entire charge of the business. He bought all the goods, attended to the sales with the help of a clerk, and generally to all appearance managed the store as though it belonged to himself. Sam Wolf came over from Johnson's more or less frequently, sometimes once a week, sometimes once a month, or at longer intervals. Many of his visits, perhaps the greater number, were made on Sunday. Upon this point his own testimony is not materially different from that of the government's witnesses. What he did when there is not shown,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

nor the length of his stay on any occasion. In short, except the fact that he was president of the company and now and then visited the store, there is no evidence whatever that he knew anything about the condition of the business, or had any reason to suspect that his brother, in the fall of 1914, was secretly removing to other places a considerable portion of the stock of goods then on hand.

In January, 1915, the Aiken Dry Goods Company was adjudicated an involuntary bankrupt, and a trustee appointed in due course. It was found upon investigation that Benjamin Wolf, some two or three months before, had taken from the store large quantities of merchandise, mostly shoes and men's clothing, and concealed the same at two farmhouses in the country, each about a dozen miles away but in different directions from Aiken. The goods taken to one of these places were carried by the farmer who owned it, and he testified that he did so at the request of Ben Wolf and some time in the month of November. The goods taken to the other place were shown to have been carried there by Ben Wolf himself about the last of September or first of October. The property thus discovered was turned over to the trustee and sold by him in March, 1915. Not long afterwards both brothers were indicted.

The testimony at the trial covers nearly 60 pages of the printed record, but the bulk of it relates solely to the matters just mentioned, the finding of a quantity of merchandise at the two farmhouses, its identification as part of the stock of the Aiken store, its transfer to town and delivery to the trustee, and its appraisal and sale by him. Of proof that even tends to connect Sam Wolf in any way with the removal or concealment of this property there is not the slightest word. Indeed, so far as he is concerned, the evidence is not only unconvincing but exceedingly meager. Whilst the guilt of Ben Wolf was abundantly proven, the case against Sam Wolf appears to rest wholly upon inference and conjecture.

In saying this we do not overlook the claim that Sam Wolf on one occasion directed Powell, the clerk, to buy tickets and check three trunks to Johnson's. The fact asserted, however, is by no means established. Powell virtually denies it on the witness stand, though he seems to admit, in answer to a question including other elements, that he so told the government's representatives the night before. Without reviewing his testimony in detail, it is sufficient to note that as a witness he refuses to say that the trunks were checked at Sam Wolf's direction; nor does he concede, when the specific question is put to him, that he had so stated in the district attorney's office. On the contrary, he avers positively that Sam Wolf did not give him the money for the tickets, and adds, "I don't think he was there that day." It is also to be noted that Powell was not asked whose trunks they were, when they were brought there, from what part of the store they were taken, whether he knew anything about their contents, nor, strangely enough, to whom the checks and tickets were delivered. In short, and to say the least, the proof that Sam Wolf directed the shipment of these trunks is far from persuasive. But assuming he did, or that a jury might so find, we are quite unable to see that it indicates any wrong-

doing on his part. Powell says, and nothing appears to the contrary, that it was a common occurrence to ship trunks from this store, that drummers very often left their trunks there, that goods sold to customers were frequently sent out in trunks and boxes, and that he shipped the trunks in question "like I always did the others." In a word, taking all the testimony into account, it seems to us that the incident here considered cannot fairly be regarded as even suspicious; and this impression is confirmed by the fact that no effort appears to have been made to trace the movement of these trunks, to find out whether they were actually taken to Johnson's, and, if so, what was done with them when they got there, or to ascertain whether there were any goods in the store at that place, or elsewhere under Sam Wolf's control, which had previously been in the Aiken store. Moreover, on the government's theory that Sam Wolf was conspiring with his brother to remove and conceal a large portion of the Aiken stock, it is certainly a tax upon credulity to suppose that he would openly engage in sending by public conveyance trunks of merchandise from that stock to his own store at Johnson's. In other words, the circumstance of which so much is sought to be made is fully consistent with honest purpose; it is absurdly inconsistent with criminal intent. Granting that it happened, we are of opinion that it gives no support to the charge against Sam Wolf.

[1, 2] The case against him, then, rests wholly upon the fact that he was president of the Aiken Company and visited the store from time to time as above stated. Is this sufficient to justify the jury in finding a verdict of conviction? We are constrained, after careful study of the record, to answer this question in the negative, and our reasons for so concluding will be briefly outlined. To begin with, the testimony shows that the goods removed by Ben Wolf were carried away in trunks and packing cases, leaving the pasteboard boxes, or cartons, in which they had been kept for sale, standing on the shelves. Smoak, the trustee, says they found a great many empty boxes in sight in the store, with others having in them little or nothing of value, and he repeats the statement that if these boxes had been full of goods there would not have been any bankruptcy. The only reasonable inference from this is that the store to all appearance contained the usual stock of merchandise. That is to say, it looked just the same after the depletion as it did before. There was nothing open to the eye which would suggest what Ben Wolf had done. This being so, it is surely not impossible, even if it be improbable, that Sam Wolf was the victim of shrewd deception. That he had confidence in his brother is evidenced by the fact that he gave over to him the entire conduct of the Aiken store. On the assumption that he himself had no unlawful design, and that he trusted Ben Wolf as a brother would naturally be trusted, it seems to us quite within the bounds of belief that he remained unaware of the fraud until bankruptcy brought on exposure. Certainly, as we see it, there is no proof of anything done or said by him which warrants the inference that he had prior knowledge of Ben Wolf's misconduct. True, he was the nominal head of the concern, presumably had a large interest in the business, visited the store at varying inter-

vals, and had opportunity doubtless to find out that a considerable part of the stock had disappeared. But moral probability, however strong, cannot take the place of legal evidence, and inferences which the jury may draw in a case like this must be based upon facts which of themselves tend to establish the guilt of the accused. In our judgment, such a basis is not found in the case here presented.

[3] In the face of a situation like this, where suspicion is almost instinctive, we are liable to forget the nature and degree of that protection which the law affords by the presumption of innocence. It may therefore be profitable to recall the forceful words of Mr. Justice (now Chief Justice) White, in Coffin v. United States, 156 U.'S. 458, 15 Sup. Ct. 404, 39 L. Ed. 481:

"Now the presumption of innocence is a conclusion drawn by the law in favor of the citizen, by virtue whereof, when brought to trial upon a criminal charge, he must be acquitted, unless he is proven to be guilty. In other words, this presumption is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced, to overcome the proof which the law has created."

As already said, the only evidence against Sam Wolf is the fact that he was president of the company and more or less often visited the store. This might be enough in a civil proceeding to make him responsible for the acts of his brother, but it is not enough, we are persuaded, to support the inference that he committed the crime of "knowingly and fraudulently" concealing property belonging to the bankrupt estate. The "proof created by the law" is not overcome by evidence merely of facts which are not plainly inconsistent with innocence. To hold otherwise is to assume, as the government contends, that, because Sam Wolf was president and came to the store now and then, he not only might have known and ought to have known, but that he must have known, what his brother was doing. In our judgment the latter assumption is clearly unwarranted, and it therefore results that the verdict against him rests in reality upon plausible conjecture and not upon proof of incriminating facts. It may be true, as the learned district attorney asserts in his brief, that Sam Wolf is the chief culprit and most deserving of punishment because he instigated the whole fraudulent scheme; and it may also be true, as is further asserted, that his appearance on the witness stand and manner of testifying induced the belief that he was undoubtedly guilty. But this is simply begging the question, since it is plain that opinion based upon probability is wholly insufficient to overcome the legal presumption, and equally plain that a defendant is not to be convicted because the jury think that he looks like a criminal. In short, we are convinced that no case for submission was made against Sam Wolf, and therefore a verdict in his favor should have been directed.

[4] A word as to the validity of the indictments. They are alleged to be bad for the reason that the crime of concealing property, as defined by section 29b, can be committed only by a bankrupt, and therefore as the bankrupt here is the Aiken Dry Goods Company, and not either Sam Wolf or Benjamin Wolf as individuals, that they are immune from prosecution. The contention is not without merit or the support of judicial opinion. United States v. Lake (D. C.) 129 Fed.

499; Field v. United States, 137 Fed. 6, 69 C. C. A. 568. The Supreme Court, also, in United States v. Rabinowich, 238 U. S. 78, 35 Sup. Ct. 682, 59 L. Ed. 1211, said that the question "is at least doubtful," and refrained from deciding it. The contrary view is held in United States v. Young & Holland Co. (C. C.) 170 Fed. 110, where the subject is fully discussed and a number of decisions cited. See, also, Cohen v. United States, 157 Fed. 651, 85 C. C. A. 113; United States v. Freed (C. C.) 179 Fed. 236; Roukous v. United States, 195 Fed. 353, 115 C. C. A. 255; Kaufman v. United States, 212 Fed. 613, 129 C. C. A. 149, Ann. Cas. 1916C, 466; and the opinion of the learned district judge overruling the demurrers in this case. We are better satisfied with the reasoning of these later cases, and therefore disposed to follow them until the question is otherwise decided by the court of last resort. Besides, we think the indictments should be sustained, under the authorities just cited, on the counts charging the defendants with aiding and abetting the concealment of the bankrupt's property.

The conclusion we reach is that the judgment against Benjamin Wolf should be affirmed, but the judgment against Sam Wolf should be reversed, and the case as to him remanded, with instructions to grant a new trial.

Reversed.

WOODS, Circuit Judge (dissenting). I concur in the opinion of the majority in so far as it sustains the indictments. I dissent from the conclusion that the District Judge should have directed the acquittal of Sam Wolf for lack of evidence tending to prove his guilt.

The Aiken Dry Goods Company was adjudged an involuntary bankrupt on January 22, 1915. Sam Wolf, the president, and Ben Wolf, the secretary of the corporation, were convicted of fraudulently concealing the assets of the corporation. No question is made of the guilt of Ben Wolf. A short statement of the material evidence, it seems to me, will show that it tended to prove the guilt of Sam Wolf.

Owning and conducting a mercantile business at the town of Johnson's where he lived, Sam Wolf in 1913 established a similar business at Aiken, 30 miles distant. About a year afterwards he incorporated the Aiken business and put his brother Ben in charge as manager. There is no evidence that Ben contributed anything to the capital stock or that he had any interest except what might have been bestowed on him by his brother. Sam visited the store, sometimes once a week and sometimes once in two or three weeks. In the autumn of 1914, according to the testimony of Sam Wolf, the corporate assets were a stock of goods of about $3,000 and some accounts due to the corporation. After bankruptcy there was found in the store goods of the appraised value of $1,000, which brought at the sale $562. During the months of September, October, and November, five or six trunks and three or four boxes of goods were taken out of the store by Ben Wolf; and they were found concealed on the premises of two friendly farmers in the country. This concealed merchandise consisted mainly of shoes and overalls. Their estimated value was $1,400, and the proceeds of their sale $605.

Reasonable men might well refuse to believe that one-half of a small stock of goods could have been taken out of the store in such a short period of time without the knowledge of the man who had the chief, if not the sole, proprietary interest in it when he was visiting the store every week or two. It is true there were some empty boxes, but it is improbable that Ben Wolf meant to defraud his brother Sam and deceive him with empty boxes. Shoes, overalls, and trunks are bulky articles, and the abstraction of such articles to the value of $1,400 from a stock of $2,500 or $3,000 could hardly fail to attract the attention of an owner who had learned to observe and value goods by carrying them on his back as a peddler.

But aside from this, the proof is direct and strong that Sam Wolf himself, through Tom Powell, the clerk in the store, abstracted and concealed goods. Powell, although offered as a witness by the government, was strongly hostile to the prosecution and favorable to the defendants. He testified directly and positively that by direction of Sam Wolf he shipped three trunks of goods in the latter part of the year 1914 from the store in Aiken to Johnson's, where Wolf lived. It is true that he varied this statement in the manifest effort to shield the defendants, but this effort to shift only made his first statement the more important and credible. The craft of the method of shipment directed by Sam Wolf was of weight against him when taken with the other circumstances. Instead of boxing the goods and shipping them as freight, passenger tickets were purchased, and the goods were shipped in trunks checked as baggage. By this method he made it practically impossible to trace the shipment by the railroad records, since passengers who check trunks are not identified either on receipt or delivery of the trunks. It seems to me these circumstances even as they appear in the printed record support the inference of guilt on the part of Sam Wolf in the minds of reasonable men. Before the District Judge and the jury they were vitalized by the personality and the manner of the defendants and other witnesses. Whether they were convincing of guilt beyond a reasonable doubt was, of course, a question for the jury and not the court.